USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 11/16/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------- X

U.S. BANK NATIONAL ASSOCIATION,
*as Trustee for the Registered Holders of Wells Fargo Commercial Mortgage Securities, Inc., Multifamily Mortgage Pass-Through Certificates, Series 2020-SB70*,

Plaintiff,

-v-

295 E 149 LLC, et al.,

Defendants.

---------------------------------------------------------------------- X

26-cv-9124 (LJL)

MEMORANDUM AND ORDER

LEWIS J. LIMAN, United States District Judge:

Plaintiff U.S. Bank National Association, as Trustee for the Registered Holders of Wells Fargo Commercial Mortgage Securities, Inc., Multifamily Mortgage Pass-Through Certificates, Series 2020-SB70 ("Plaintiff"), by and through its special servicer CWCapital Asset Management LLC, moves, by order to show cause, for an order appointing OPEX CRE Management (the "Receiver") as receiver of the real property located at 295 East 149th Street, Bronx, New York 10451 (Block 2331, Lot 66) (the "Mortgaged Property"). Dkt. No. 6. The motion is opposed. On Friday, November 13, 2026, the Court granted Plaintiff's application with an opinion to follow. *See* Dkt. No. 20. This Memorandum and Order sets forth the Court's reasoning for granting the application.

**BACKGROUND**

The following facts are drawn from the verified complaint, the sworn declarations and exhibits submitted in connection with the motion, and the representations of counsel at the November 13, 2026 hearing. Except where noted, they are undisputed.

## I. The Mortgaged Property

The Mortgaged Property is a six-story, walk-up mixed-use building in the South Bronx. Dkt. No. 7 ¶ 9. It contains 22 rent-stabilized residential units, three ground-floor retail suites, and a rooftop wireless lease. *Id.* As of May 2026, the residential units were 91% occupied and the retail space was fully leased. *Id.* The rent roll shows monthly revenue of just under $57,000. *Id.*

## II. The Loan Documents

Plaintiff is the lawful holder and owner of a note, mortgage, and security interest with respect to the Mortgaged Property. Dkt. No. 1 ¶ 3. Defendants 295 E 149 LLC and PF Mott Haven LLC (collectively, "Borrowers") are the owners of the Mortgaged Property. *Id.* ¶¶ 4–5, 8. On September 9, 2019, Hunt Mortgage Partners, LLC (the "Original Lender") made a loan to Borrowers (the "Loan") pursuant to a loan agreement of the same date (the "Loan Agreement"). *Id.* ¶¶ 6, 12; Dkt. No. 1-1.[1] Borrowers' obligations under the Loan are secured by a Consolidation, Extension, and Modification Agreement dated September 9, 2019, which consolidated prior mortgages into the Multifamily Mortgage, Assignment of Rents and Security Agreement annexed thereto (together, the "Mortgage"), and are evidenced by a note executed by Borrowers in favor of the Original Lender in the original principal amount of $5,198,000 (the "Note"). Dkt. No. 1 ¶¶ 14–15; Dkt. No. 1-3.[2] The Mortgage contains language that it constitutes an assignment of leases and rents securing the obligations under the Note. Dkt. No. 1 ¶ 18. The Loan Agreement also grants Plaintiff a security interest in Borrowers' personal property, which

---

[1] The Original Lender assigned the Loan, the Note, and the Mortgage to the Federal Home Loan Mortgage Corporation, which, in turn, assigned them to Plaintiff effective January 29, 2020. Dkt. No. 1 ¶¶ 20–22. For simplicity, the Court refers to the lender under the Loan Documents as Plaintiff, including where those documents refer to the Original Lender.

[2] Citations to this docket entry use ECF pagination.

was perfected by UCC financing statements. *Id.* ¶¶ 13, 24–25. Defendants Robert Rosenberg and Pincus Friedman (together, "Guarantors") executed a guaranty of certain of Borrowers' recourse obligations (the "Guaranty," and together with the Loan Agreement, the Note, and the Mortgage, the "Loan Documents"). *Id.* ¶¶ 6, 19, 33.

The Loan Agreement defines an "Event of Default" as the failure of Borrowers "to pay or deposit when due any amount required by the Note, this Loan Agreement, or any other Loan Document." Dkt. No. 1-1 § 8.01(a). The Loan Agreement further provides that "[u]pon an Event of Default, [Plaintiff] may exercise any or all of its rights and remedies provided under the Loan Documents and Borrower[s] will pay all associated costs, including Attorneys' Fees and Costs." *Id.* § 8.03(a).

Section Three of the Mortgage provides that as consideration for the loan extended to Borrowers, Borrowers "absolutely and unconditionally assign[] and transfer[] to [Plaintiff] all Rents." Dkt. No. 1-3 at 21 § 3(a). The Mortgage defines "Rents" to include "all rents (whether from residential or non-residential space), revenues and other income" of the Mortgaged Property. *Id.* at 20. Until the occurrence of an Event of Default, Plaintiff grants to Borrowers "a revocable license to collect and receive all Rents." *Id.* at 21 § 3(b)(i). After the occurrence of an Event of Default and during the continuation of such Event of Default, Plaintiff has the right "to collect, sue for and compromise Rents and [to] direct[] each tenant of the Mortgaged Property to pay all Rents to, or as directed by, [Plaintiff]." *Id.* at 22 § 3(b)(iii). The Mortgage explicitly gives Plaintiff the right to seek the appointment of a receiver during the period of an Event of Default and contains Borrowers' consent to that remedy:

> [I]f an Event of Default has occurred and is continuing, regardless of the adequacy of [Plaintiff's] security, without regard to Borrower[s'] solvency and without the necessity of giving prior notice (oral or written) to Borrower[s], [Plaintiff] may apply to any court having jurisdiction for the appointment of a receiver for the

> Mortgaged Property to take any or all of the actions set forth in the preceding sentence.[3] If [Plaintiff] elects to seek the appointment of a receiver for the Mortgaged Property at any time after an Event of Default has occurred and is continuing, Borrower[s], by [their] execution of this Instrument, expressly consent[] to the appointment of such receiver, including the appointment of a receiver *ex parte* if permitted by applicable law.

*Id.* at 23 § 3(c)(ii).

The Note requires Borrowers to make principal and interest payments on the first of each month until the maturity date of October 1, 2039. Dkt. No. 1 ¶¶ 27, 34; Dkt. No. 1-2 § 3(a). The Note further provides that, upon the occurrence of an Event of Default, "the entire unpaid Principal Amount, any accrued interest, any Prepayment Charge, and all other amounts payable under this Note and any other Loan Document will immediately become due and payable, at the option of [Plaintiff], without any prior Notice to Borrower[s] (unless applicable law requires Notice)." Dkt. No. 1 ¶ 32; Dkt. No. 1-2 § 5(e).

## III. Borrowers' Defaults

By letter dated March 13, 2026, Plaintiff provided written notice of certain of Borrowers' defaults to Borrowers and Guarantors (the "Notice of Events of Default"). Dkt. No. 1 ¶ 35; Dkt. No. 1-11. The Notice of Events of Default was based on the failure of Borrowers to make any monthly payments starting with the payment due on December 1, 2025, and continuing each month thereafter. Dkt. No. 1 ¶ 34; Dkt. No. 1-11. In the Notice of Events of Default, Plaintiff further advised Borrowers that by reason of the existence of the Events of Default, it was "considering the exercise of its rights and remedies under the Loan Documents, at law and in equity, including, without limitation, commencing a foreclosure of the [Mortgaged] Property, and seeking the appointment of a receiver for the [Mortgaged] Property." Dkt. No. 1-11.

[3] The preceding sentence gives Plaintiff the right, while an Event of Default is continuing, "to perform all acts that [Plaintiff] in its discretion determines to be necessary or desirable for the operation and maintenance of the Mortgaged Property." *Id.* at 22 § 3(c)(i).

As of May 1, 2026, there was due and owing to Plaintiff an outstanding principal balance of $4,628,541.02 together with accrued and unpaid interest thereon. Dkt. No. 1 ¶ 36. Since the first Event of Default, the Loan has accrued interest at the Default Annual Interest Rate, currently 11.33047% per annum. *Id.* ¶¶ 31, 35. Plaintiff has also made protective advances to cover Borrowers' failure to pay required reserves and other expenses. *Id.* ¶ 38. Borrowers have not paid debt service for more than ten months and have allowed environmental control violations and judgments to accumulate against the Mortgaged Property. Dkt. No. 7 ¶ 23. The real and personal property securing the Loan constitutes Borrowers' sole assets. Dkt. No. 1 ¶ 54.

Plaintiff asserts, on information and belief, that the Rents are not being applied to the maintenance and security of the Mortgaged Property or to the Loan. Dkt. No. 7 ¶ 24. At the November 13, 2026 hearing, counsel for Borrowers represented that the rents collected have been applied to the costs of operating the building, including heat and maintenance, and that Borrowers currently hold approximately $85,000, which counsel stated would cover the November 2026 mortgage payment and the outstanding taxes. Borrowers do not dispute that the Mortgaged Property is worth less than the outstanding debt.

## IV. The October 14, 2026 Site Visit

Plaintiff conducted a site visit of the Mortgaged Property on October 14, 2026. *Id.* ¶ 13. Prior to conducting the site visit, Plaintiff gave notice to Borrowers of its intent to conduct the visit, including the date and time of the visit, and asked Borrowers to provide contact information for the property manager who would be on site to lead the tour. *Id.* ¶ 10. Although Simon Moskowitz, a representative of Borrowers, responded to the notice, Borrowers did not confirm the visit and did not arrange for property management personnel to be on site for the visit. *Id.* ¶¶ 11–13. At the time of the site visit, the Mortgaged Property was completely unsecured and both front doors (as well as an interior door) were unlocked. *Id.* ¶ 14. Clothes

were hanging from railings on the top floor of the building, giving the impression that transient persons were living there. *Id.* ¶ 15. A man who introduced himself as the owner of the retail tenant at the Mortgaged Property told Plaintiff that property management rarely came to the site. *Id.* ¶ 17. Nearly two hours after the site visit, Mr. Moskowitz emailed Plaintiff's representative and acknowledged that he had not been at the property. *Id.* ¶ 19. On October 16, 2026, Mr. Moskowitz emailed again to ask whether the superintendent had been on site. *Id.* ¶ 21. Mr. Moskowitz did not dispute that the building was unsecured at the time of the site visit, responding that the doors were repaired later in the day of the site visit. *Id.* ¶ 22. A complaint filed with the New York City Department of Housing Preservation and Development ("HPD") on October 8, 2026, reporting a broken lobby door, was still open when Plaintiff's representative later checked HPD's website. *Id.* ¶ 20; Dkt. No. 7-4 at 2.

**PROCEDURAL HISTORY**

Plaintiff filed its verified complaint against Borrowers on Friday, October 16, 2026. Dkt. No. 1. In addition to Borrowers, Plaintiff names as defendants Guarantors; the New York City Environmental Control Board, which is the holder of liens against Borrowers; and "John Doe" Nos. 1–25, who are tenants, occupants, or other persons or entities who may have possessory liens or other interests in the Mortgaged Property and are named to terminate those interests. *Id.* ¶¶ 6–7, 9. Plaintiff seeks orders of foreclosure on the Mortgage and on the UCC security interests that it holds with respect to the Mortgaged Property, a judgment against Guarantors, and the appointment of a receiver. *Id.* ¶¶ 41–58.

The case was assigned to the undersigned on Monday, October 19, 2026. *See* Oct. 19, 2026 Minute Entry. On October 22, 2026, Plaintiff filed a proposed order to show cause seeking the appointment of a receiver on an emergency basis. Dkt. No. 6. Plaintiff also filed a memorandum of law and the declarations of Victoria Howe and Gary F. Eisenberg in support of

the appointment of a receiver. Dkt. Nos. 7–9. The Court scheduled a show cause hearing for October 27, 2026, which was rescheduled to November 5, 2026, at the request of the parties. Dkt. Nos. 11–12. At the show cause hearing, the Court granted Borrowers' request to submit papers in opposition to the motion for appointment of a receiver and set a deadline of November 10, 2026, for Borrowers to file such papers. Dkt. No. 16. The Court set a deadline of November 11, 2026, for the filing of reply papers. *Id.*

On November 10, 2026, Borrowers filed a memorandum of law in opposition to the motion for appointment of a receiver and the declaration of Simon Moskowitz. Dkt. Nos. 17–18. Mr. Moskowitz avers that he is the property manager of the Mortgaged Property. Dkt. No. 18 ¶ 2. Mr. Moskowitz states that "there are no past due, unpaid expenses due and owing on the [Mortgaged Property] with the exception of mortgage payments, tax and sewer payments and the requisite insurance coverage is intact." *Id.* ¶ 4. He states that the broken lock at the front door has now been fixed and that the clothing hanging on the top floor of the building belonged to a "residential tenant [who] continues to dry her laundry on a stairway leading to the roof, despite our continued protests." *Id.* ¶¶ 5–6. He states that all tenants who are behind in their rent have "been served with Landlord & Tenant actions or are in the process of being served." *Id.* ¶ 7. He further avers that "[t]here are no emergency conditions or out of control situations at this property." *Id.* ¶ 10. He also asserts that Borrowers never scheduled an appointment with Plaintiff's representative, and that Plaintiff's representative "never confirmed [the visit with him] prior to her arrival." *Id.* ¶ 8.

On November 11, 2026, Plaintiff filed a reply memorandum of law in further support of the motion for appointment of a receiver. Dkt. No. 19. The Court held a further hearing on the motion on November 13, 2026. *See* Dkt. No. 16.

## LEGAL STANDARD

"Whether a federal court should appoint a receiver in a diversity action is governed by federal law." *U.S. Bank Nat'l Ass'n v. Nesbitt Bellevue Prop. LLC*, 866 F. Supp. 2d 247, 249 (S.D.N.Y. 2012) (citing *Varsames v. Palazzolo*, 96 F. Supp. 2d 361, 365 (S.D.N.Y. 2000)); *see* 12 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2983 (3d ed.).[4] "Under Rule 66 of the Federal Rules of Civil Procedure, '[a] federal court has the power in equity to appoint a receiver in order to protect a party's interest in property.'" *Delaware Tr. Co. as Tr. for PT ATL SPV Grantor Tr. v. Sherman Holdings USA LLC*, 2026 WL 2163648, at *4 (S.D.N.Y. June 5, 2026) (quoting *Varsames*, 96 F. Supp. 2d at 365), *report and recommendation adopted sub nom. Delaware Tr. Co. n/k/a CSC Delaware Tr. Co., as Tr. for the PT ATL SPV Grantor Tr. v. Sherman Holdings USA LLC*, 2026 WL 2151692 (S.D.N.Y. July 27, 2026). "A district court may appoint a receiver to manage a defendant's assets during litigation." *Rosen v. Siegel*, 106 F.3d 28, 33 (2d Cir. 1997).[5] "'The appointment of a receiver in the first instance is to be considered an extraordinary remedy and should be employed cautiously and granted only

---

[4] Plaintiff relies on New York decisions holding that, where a mortgage authorizes the appointment of a receiver upon default and the mortgagor has defaulted, "proof of the necessity of a receiver is not required." Dkt. No. 9 at 7–8 (quoting *F.D.I.C. v. Vernon Real Est. Invs., Ltd.*, 798 F. Supp. 1009, 1013 (S.D.N.Y. 1992)); *see* N.Y. Real Prop. Law § 254(10); *GECMC 2007-C1 Ditmars Lodging, LLC v. Mohola, LLC*, 924 N.Y.S.2d 531, 532–33 (2d Dep't 2011). Those decisions do not define the showing required here. Because the appointment of a receiver is an equitable remedy, federal courts apply federal standards even where state law governs the parties' underlying rights. *See* 12 Wright & Miller, *supra*, § 2983. State law remains relevant to the weight of the parties' agreement; the Second Circuit cited Real Property Law § 254(10) in holding that a mortgage provision authorizing a receiver upon default "strongly supports the appointment of a receiver." *Citibank, N.A. v. Nyland (CF8) Ltd.*, 839 F.2d 93, 97 (2d Cir. 1988). But under federal law, such a provision does not make the appointment "automatic." *Id. Vernon*, which applied § 254(10) without addressing whether state or federal law governs, is not to the contrary. *See* 798 F. Supp. at 1012–13.

[5] "The classic example in which the appointment of a receiver is ancillary or incidental to some primary form of relief is where a plaintiff has brought a foreclosure action and requests a temporary receiver pending the foreclosure." *Nesbitt Bellevue*, 866 F. Supp. 2d at 255.

when clearly necessary to protect plaintiff's interests in the property.'" *Melnick v. Press*, 2007 WL 2769490, at *1 (E.D.N.Y. Sept. 21, 2007) (Bianco, J.) (quoting *Citibank, N.A. v. Nyland (CF8), Ltd.*, 839 F.2d 93, 97 (2d Cir. 1988)). Courts in this District recognize certain factors that are "relevant to establishing the need" for the appointment of a receiver:

> Fraudulent conduct on the part of defendant; the imminent danger of the property being lost, concealed, injured, diminished in value, or squandered; the inadequacy of the available legal remedies; the probability that harm to plaintiff by denial of the appointment would be greater than the injury to the parties opposing appointment; and, in more general terms, plaintiff's probable success in the action and the possibility of irreparable injury to his interests in the property.

*Nesbitt Bellevue*, 866 F. Supp. 2d at 249–50 (quoting *Varsames*, 96 F. Supp. 2d at 365); *accord Kairos Credit Strategies Operating P'ship, LP v. Friars Nat'l Ass'n, Inc.*, 2023 WL 3675921, at *2 (S.D.N.Y. May 26, 2023).

Generally, "the plaintiff bears the burden to make an adequate showing that the appointment of a receiver is necessary." *Computershare Tr. Co. Nat'l Ass'n as Tr. for Certificateholders of CFSP 2024-AHP1 Mortg. Tr., Com. Mortg. Pass-Through Certificates, Series 2024-AHP1 Mortg. Tr. v. 907 Assocs. LLC*, 2025 WL 2402262, at *2 (S.D.N.Y. Aug. 19, 2025) (internal quotation marks omitted). "However, where the defendant has consented to the appointment of a receiver in the mortgage agreement, the burden shifts to the defendant to demonstrate why a receiver should not be appointed." *Id.*; *see also Wilmington Tr., Nat'l Ass'n as Tr. for Registered Holders of Credit Suisse First Boston Mortg. Sec. Corp., Multifamily Mortg. Pass-Through Certificates, Series 2019-SB61 v. 1215 Brook LLC*, 2026 WL 915297, at *4 (S.D.N.Y. Apr. 3, 2026) ("Where the party opposing the appointment clearly consented to the appointment in a contract, courts in this district have deemed that that party 'bears the burden of demonstrating why a receiver should not be appointed.'" (quoting *D.B. Zwirn Special Opportunities Fund, L.P. v. Tama Broad., Inc.*, 550 F. Supp. 2d 481, 491 (S.D.N.Y. 2008))).

## DISCUSSION

Plaintiff has established entitlement to a receiver. Section 3(c)(ii) of the Mortgage provides that, if an Event of Default has occurred and is continuing, Plaintiff "may apply to any court having jurisdiction for the appointment of a receiver," and that Borrowers "expressly consent[] to the appointment of such receiver." Dkt. No. 1-3 at 23 § 3(c)(ii). Where "it is undisputed that several events of default had occurred," such a provision "strongly supports the appointment of a receiver." *Nyland*, 839 F.2d at 97; *accord Nesbitt Bellevue*, 866 F. Supp. 2d at 250. Borrowers do not dispute that they have made no mortgage payments since December 2025, and each missed payment is a separate Event of Default. Dkt. No. 1 ¶ 34; Dkt. No. 17 at 7; Dkt. No. 18 ¶ 4. And because Borrowers expressly consented to the appointment of a receiver, it is their burden to show why one should not be appointed. *Computershare*, 2025 WL 2402262, at *2.

Borrowers argue that their consent to the appointment of a receiver does not deprive the Court of its equitable discretion to determine whether such appointment is necessary or appropriate. Dkt. No. 17 at 1. That argument is true as far as it goes. The Court is not bound by the parties' agreement that, upon an Event of Default, a receiver may be appointed. *See Wilmington Tr.*, 2026 WL 915297, at *3 ("[C]ourts retain discretion to appoint a receiver even in the presence of a contractual provision authorizing a lender to apply for the appointment."); *Wells Fargo Bank, Nat'l Ass'n v. 3708 Vestal Pkwy E., LLC*, 2023 WL 4741216, at *4 (S.D.N.Y. July 25, 2023) ("The mere existence of such contractual provision does not . . . dispose of the Court's inquiry in plaintiff's favor." (citation omitted)); *F.D.I.C. v. Vernon Real Est. Invs., Ltd.*, 798 F. Supp. 1009, 1012 (S.D.N.Y. 1992) (court "has the discretion to deny appointment of a receiver under the appropriate circumstances even though the mortgage provides the mortgagee a specific right to an appointment"). But in this case, the existence of that agreement provides

strong evidence that a receiver should be appointed, and Borrowers have not controverted the other key facts that support the appointment of a receiver.[6]

The undisputed defaults also establish that Plaintiff is likely to succeed on its foreclosure claim. *See Nesbitt Bellevue*, 866 F. Supp. 2d at 250 (finding that, because there was "no dispute that the defendants have defaulted on the loans at issue," the plaintiff was "likely to succeed in ultimately obtaining possession of the properties"). But a default, standing alone, does not warrant a receiver. A receiver does not cure the default; it protects the collateral while the foreclosure action is pending. Missed payments show that the lender will likely prevail, not necessarily that the property is at risk before judgment. And because every foreclosure begins with a default, treating default as sufficient would make an "extraordinary remedy" routine. *Nyland*, 839 F.2d at 97. The Court therefore must still determine whether Borrowers have shown that a receiver is not "clearly necessary to protect plaintiff's interests in the property." *Id.*

*Vestal* illustrates the point. There, the borrower's repeated defaults likewise established the lender's likelihood of success, 2023 WL 4741216, at *6, but the court denied a receiver because nothing suggested that the collateral was at risk: more than $200,000 a month in hotel revenue flowed into a lockbox that the lender controlled, the hotel's revenue was increasing after a $1.4 million renovation, the lender offered no evidence that the property was insufficient security for the loan, and a receiver threatened the hotel's Hilton franchise. *Id.* at *2, *5. In

[6] The cases on which Borrowers rely do not suggest otherwise. None involved a defaulting mortgagor that had consented to a receiver. *See Ryan Beck & Co., Inc. v. Daly Holdings, Inc.*, 2006 WL 3775964, at *1–2 (S.D.N.Y. Dec. 19, 2006) (denying broker-dealer's request for receiver over private investment company where broker-dealer offered no facts supporting its allegation of insolvency); *Haggiag v. Brown*, 728 F. Supp. 286, 288–90, 294 (S.D.N.Y. 1990) (dispute among co-owners of closely held corporation whose building's rent roll had nearly tripled under existing management); *Cottam v. Glob. Emerging Cap. Grp., LLC*, 2017 WL 11667637, at *3–4 (S.D.N.Y. Dec. 29, 2017) (stock-subscription dispute in which the complaint sought no equitable relief and plaintiff did not allege concealment or squandering of assets).

short, the evidence would support the conclusion that, following the events of default, the financial condition of the property had turned around. Here, however, Borrowers, not Plaintiff, control the Rents; Borrowers do not dispute that the Mortgaged Property is worth less than what they owe; and the record reflects unpaid taxes and a building that is not being actively managed.

Those circumstances establish an imminent danger to Plaintiff's collateral—"a critical factor in the analysis of whether to appoint a receiver." *Nesbitt Bellevue*, 866 F. Supp. 2d at 250. First, Borrowers continue to collect nearly $57,000 per month in Rents, Dkt. No. 7 ¶ 9, that the Mortgage assigns to Plaintiff, Dkt. No. 1-3 at 21 § 3(a), while paying nothing on the Loan. "[T]he elimination of rental income is a direct impairment of the plaintiff's collateral." *Wilmington Tr., Nat'l Ass'n v. Winta Asset Mgmt., LLC*, 2020 WL 5802365, at *1 (S.D.N.Y. Sept. 28, 2020). With every dollar of Rents that is diverted from the mortgage payments, Plaintiff's security becomes increasingly impaired. Counsel for Borrowers represented at the November 13, 2026 hearing that the Rents have been applied to operating the building and that Borrowers now hold approximately $85,000. But Borrowers have provided no accounting or evidence to support that every dollar Borrowers have received has been spent (let alone spent wisely) on the property. And by counsel's own description, nearly a year of rent collections has left enough to cover, at most, one month's mortgage payment and the outstanding taxes. This is not a situation such as that in *Vestal* in which the property was sufficient to secure the borrower's obligation and was becoming more valuable over time. Second, Borrowers have left real estate taxes and sewer charges unpaid, Dkt. No. 18 ¶ 4—liens to be paid from the proceeds of any foreclosure sale, *see* Dkt. No. 1 at 15, that further erode Plaintiff's security directly, *see Vestal*, 2023 WL 4741216, at *5 (describing case in which unpaid property taxes harmed the properties' value)—and environmental control violations have ripened into unpaid judgments, Dkt. No. 7

¶ 7 & n.2. Third, the building is not being actively managed. At the time of Plaintiff's site visit, the front doors were unlocked, and a retail tenant reported that management rarely came to the site. *Id.* ¶¶ 14, 17. Borrowers do not dispute that a residential tenant continues to hang laundry on a stairway leading to the roof "despite [their] continued protests," Dkt. No. 18 ¶ 5, and an HPD complaint about a broken lobby door remained open, Dkt. No. 7 ¶ 20. Indeed, it appears that it was not until Borrowers were confronted with the risk of a receiver that they made efforts to repair the lock. If this motion were denied and the risk of a receiver eliminated, there would be no assurance whatsoever that Borrowers would not revert to their prior (non)management of the property.

Borrowers argue that there is no evidence that they have totally abandoned the property and assert that Plaintiff's showing of imminent danger is based on a single visit to the site. Dkt. No. 17 at 1, 4. But the Court does not base its decision to appoint a receiver solely upon the results of that visit. It also relies on the evidence of multiple Events of Default, the diversion of Rents, the unpaid taxes, the HPD complaint, and the Environmental Control Board violations. And there is no law that requires a property to be totally abandoned or the mortgagee to make multiple site visits before the Court appoints a receiver.[7]

The available legal remedies are also inadequate. Plaintiff's primary legal remedy is foreclosure and sale. A receiver might be unnecessary if the sale proceeds would satisfy the full debt, including accrued interest and protective advances, because Plaintiff would then be made whole. *See Vestal*, 2023 WL 4741216, at *5 (finding legal remedies adequate where the lender

[7] Borrowers also request an evidentiary hearing. Dkt. No. 17 at 8–9. A court is required to hold an evidentiary hearing, however, only where facts are in dispute. *See Republic of Phil. v. N.Y. Land Co.*, 852 F.2d 33, 37 (2d Cir. 1988). The Court gave Borrowers an opportunity to respond to the motion and held a hearing. Borrowers identified no material facts that are in dispute here.

offered no evidence as to the value of the property). But Borrowers do not dispute that the Mortgaged Property is worth less than what they owe.[8] Because the Mortgaged Property and related personal property are Borrowers' only assets, Dkt. No. 1 ¶ 54, every dollar of rent not applied to the Loan increases a deficiency that Plaintiff is unlikely ever to collect, *see* Dkt. No. 19 at 3. And that shortfall grows each month as interest accrues at a default rate of more than 11% per annum. Dkt. No. 1 ¶¶ 31, 35.

The balance of hardships likewise favors appointment. Borrowers' interest in avoiding a receiver is diminished by their "voluntary accession to a receivership remedy in the bargaining process," *Kairos*, 2023 WL 3675921, at *3, and their license to collect the Rents terminated upon the Events of Default, Dkt. No. 1-3 at 22 § 3(b)(iii). Borrowers argue that a receiver will allow potential buyers to smell "the sharks in the water" and undervalue the property while the parties negotiate a possible short sale. Dkt. No. 17 at 6. But to the extent buyers are circling in anticipation of a forced sale of the Mortgaged Property, the "sharks" would already be in the water. Plaintiff has filed a public lawsuit seeking foreclosure and Borrowers do not dispute that Events of Default have occurred that would ordinarily entitle Plaintiff to foreclosure. Moreover, as the caselaw reflects (and as Plaintiff's counsel represented at the November 13, 2026 hearing), receiverships have become commonplace, with well-established mechanisms for managing a property and facilitating its sale. And unlike the hotel in *Vestal*, whose franchise required Hilton's approval of any manager, 2023 WL 4741216, at *5, an apartment building faces no comparable risk from a change in management. The harm to Plaintiff from denying a receiver,

[8] Even if Borrowers had argued that the collateral is adequate, it would be their burden to establish that point, *see Computershare*, 2025 WL 2402262, at *2, and they offer no appraisal or other evidence of the Mortgaged Property's value. Borrowers also agreed under the Mortgage that Plaintiff could seek a receiver "regardless of the adequacy of [Plaintiff's] security." Dkt. No. 1-3 at 23 § 3(c)(ii).

by contrast, is concrete: a borrower whose property is underwater has "every incentive to keep collecting rents for as long as it can," Dkt. No. 19 at 3, and each month without a receiver is another month where there is a risk of Rents that do not reach the Loan, the taxes, or the building.

Finally, Borrowers argue that there is no allegation of fraud. Dkt. No. 17 at 1. A receiver is appointed, however, to protect a property in which Plaintiff has shown that it has an interest. Here, there is no dispute that there are multiple Events of Default, that the Mortgage assigns the Rents to Plaintiff and that no payments have been made to Plaintiff from rent, and that an Event of Default entitles Plaintiff to an ultimate judgment of foreclosure. For good reason, courts have "appointed receivers even where there was no evidence of fraud." *Nesbitt Bellevue*, 866 F. Supp. 2d at 250 (quoting *D.B. Zwirn*, 550 F. Supp. 2d at 491 & n.64).

Accordingly, the Court concludes that Borrowers have not met their burden of demonstrating that a receiver is not warranted under these circumstances and that the relevant factors overwhelmingly weigh in favor of appointing a receiver in order to protect Plaintiff's interest in the Mortgaged Property.[9]

**CONCLUSION**

For the foregoing reasons, Plaintiff's emergency motion to appoint OPEX CRE Management as receiver for the Mortgaged Property is GRANTED.

SO ORDERED.

Dated: November 16, 2026
New York, New York

LEWIS J. LIMAN
United States District Judge

[9] Borrowers do not make any objections to the qualifications of Plaintiff's selected receiver, OPEX CRE Management.